B104 (FORM 104) (08/07)                                                                              EDVA

| ADVERSARY PROCEEDING COVER SHEET (Instructions on Reverse) | ADVERSARY PROCEEDING NUMBER (Court Use Only) |
|---|---|

| PLAINTIFFS | DEFENDANTS |
|---|---|
| Joseph E. Lew, Trustee of the Lew Family Trust | LandAmerica 1031 Exchange Services, Inc. |

| ATTORNEYS (Firm Name, Address, and Telephone No.) | ATTORNEYS (If Known) |
|---|---|
| Bruce E. Arkema, Kevin J. Funk, and Ronald A. Page, Jr. Cantor Arkema, PC, Post Office Box 561 Richmond, VA 23218-0561 804-644-1400 | Dion W. Hayes (McGuire Woods) One James Center, 901 East Cary Street Richmond, Virginia 23219 804-775-1000 |

| PARTY (Check One Box Only) | PARTY (Check One Box Only) |
|---|---|
| ☐ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☒ Creditor ☐ Other<br>☐ Trustee | ☒ Debtor ☐ U.S. Trustee/Bankruptcy Admin<br>☐ Creditor ☐ Other<br>☐ Trustee |

**CAUSE OF ACTION** (WRITE A BRIEF STATEMENT OF CAUSE OF ACTION, INCLUDING ALL U.S. STATUTES INVOLVED)

Declaratory Relief (11 U.S.C. Section 541); Injunctive Relief [11 U.S.C. Section 105(a)]; Breach of Contract; Conversion; Intentional Interference with Contract

## NATURE OF SUIT

(Number up to five (5) boxes starting with lead cause of action as 1, first alternative cause as 2, second alternative cause as 3, etc.)

**FRBP 7001(1) – Recovery of Money/Property**
☐ 11-Recovery of money/property - §542 turnover of property
☐ 12-Recovery of money/property - §547 preference
☐ 13-Recovery of money/property - §548 fraudulent transfer
☒ 14-Recovery of money/property - other

**FRBP 7001(2) – Validity, Priority or Extent of Lien**
☐ 21-Validity, priority or extent of lien or other interest in property

**FRBP 7001(3) – Approval of Sale of Property**
☐ 31-Approval of sale of property of estate and of a co-owner - §363(h)

**FRBP 7001(4) – Objection/Revocation of Discharge**
☐ 41-Objection / revocation of discharge - §727(c),(d),(e)

**FRBP 7001(5) – Revocation of Confirmation**
☐ 51-Revocation of confirmation

**FRBP 7001(6) – Dischargeability**
☐ 66-Dischargeability - §523(a)(1),(14),(14A) priority tax claims
☐ 62-Dischargeability - §523(a)(2), false pretenses, false representation, actual fraud
☐ 67-Dischargeability - §523(a)(4), fraud as fiduciary, embezzlement, larceny

(continued next column)

**FRBP 7001(6) – Dischargeability (continued)**
☐ 61-Dischargeability - §523(a)(5), domestic support
☐ 68-Dischargeability - §523(a)(6), willful and malicious injury
☐ 63-Dischargeability - §523(a)(8), student loan
☐ 64-Dischargeability - §523(a)(15), divorce or separation obligation (other than domestic support)
☐ 65-Dischargeability - other

**FRBP 7001(7) – Injunctive Relief**
☐ 71-Injunctive relief – imposition of stay
☒ 72-Injunctive relief – other

**FRBP 7001(8) Subordination of Claim or Interest**
☐ 81-Subordination of claim or interest

**FRBP 7001(9) Declaratory Judgment**
☒ 91-Declaratory judgment

**FRBP 7001(10) Determination of Removed Action**
☐ 01-Determination of removed claim or cause

**Other**
☐ SS-SIPA Case – 15 U.S.C. §§78aaa et.seq.
☒ 02-Other (e.g. other actions that would have been brought in state court if unrelated to bankruptcy case)

| ☐ Check if this case involves a substantive issue of state law | ☐ Check if this is asserted to be a class action under FRCP 23 |
|---|---|
| ☐ Check if a jury trial is demanded in complaint | Demand $ 2,019,379.95 |

| Other Relief Sought<br>Equitable | |
|---|---|

B104 (FORM 104) (08/07), Page 2

| BANKRUPTCY CASE IN WHICH THIS ADVERSARY PROCEEDING ARISES | | |
|---|---|---|
| NAME OF DEBTOR<br>LandAmerica Financial Group, Inc., et al. | BANKRUPTCY CASE NO.<br>08-35994 | |
| DISTRICT IN WHICH CASE IS PENDING<br>Eastern District of Virginia | DIVISION OFFICE<br>Richmond | NAME OF JUDGE<br>Kevin R. Huennekens |
| RELATED ADVERSARY PROCEEDING (IF ANY) | | |
| PLAINTIFF | DEFENDANT | ADVERSARY<br>PROCEEDING NO. |
| DISTRICT IN WHICH ADVERSARY IS PENDING | DIVISION OFFICE | NAME OF JUDGE |
| SIGNATURE OF ATTORNEY (OR PLAINTIFF)<br><br>/s/ Ronald A. Page, Jr. | | |
| DATE<br><br>December 30, 2008 | PRINT NAME OF ATTORNEY (OR PLAINTIFF)<br><br>Ronald A. Page, Jr. | |

## INSTRUCTIONS

The filing of a bankruptcy case creates an "estate" under the jurisdiction of the bankruptcy court which consists of all of the property of the debtor, wherever that property is located. Because the bankruptcy estate is so extensive and the jurisdiction of the court so broad, there may be lawsuits over the property or property rights of the estate. There also may be lawsuits concerning the debtor's discharge. If such a lawsuit is filed in a bankruptcy court, it is called an adversary proceeding.

A party filing an adversary proceeding must also complete and file Form 104, the Adversary Proceeding Cover Sheet, *unless the party files the adversary proceeding electronically through the court's Case Management/Electronic Case Filing system (CM/ECF). (CM/ECF captures the information on Form 104 as part of the filing process.) When completed, the cover sheet summarizes basic information on the adversary proceeding. The clerk of court needs the information to process the adversary proceeding and prepare required statistical reports on court activity.

The cover sheet and the information contained on it do not replace or supplement the filing and service of pleadings or other papers as required by law, the Bankruptcy Rules, or the local rules of court. The cover sheet, which is largely self-explanatory, must be completed by the plaintiff's attorney (or by the plaintiff if the plaintiff is not represented by an attorney). A separate cover sheet must be submitted to the clerk for each complaint filed.

**Plaintiffs** and **Defendants.** Give the names of the plaintiffs and defendants exactly as they appear on the complaint.

**Attorneys.** Give the names and addresses of the attorneys, if known.

**Party.** Check the most appropriate box in the first column for the plaintiffs and the second column for the defendants.

**Demand.** Enter the dollar amount being demanded in the complaint.

**Signature.** This cover sheet must be signed by the attorney of record in the box on the second page of the form. If the plaintiff is represented by a law firm, a member of the firm must sign. If the plaintiff is pro se, that is, not represented by an attorney, the plaintiff must sign.

*Per LBR 7003-1, in the EDVA, a properly completed Adversary Proceeding Cover Sheet is required.

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division

| | |
|---|---|
| IN RE: | ) |
| | ) |
| LANDAMERICA FINANCIAL GROUP, | )    Chapter 11 |
|     INC., et al., | )    Case No. 08-35994-KRH |
| | )    Jointly Administered |
|         Debtors. | ) |
| | ) |
| JOSEPH E. LEW, TRUSTEE OF THE | ) |
| LEW FAMILY TRUST, | ) |
| | ) |
| and | ) |
| | ) |
| J. J. LEW, TRUSTEE OF THE | ) |
| LEW FAMILY TRUST, | ) |
| | ) |
|         Plaintiffs, | )    Adversary Case No. _____ |
| | ) |
| v. | ) |
| | ) |
| LANDAMERICA 1031 EXCHANGE | ) |
| SERVICES, INC., | ) |
| | ) |
|         Defendant. | ) |

_____

Bruce E. Arkema (VSB No. 18625)
barkema@cantorarkema.com
Kevin J. Funk (VSB No. 65465)
kfunk@cantorarkema.com
Ronald A. Page, Jr. (VSB No. 71343)
rpage@cantorarkema.com
Cantor Arkema, P.C.
1111 East Main Street, 16th Floor
Post Office Box 561
Richmond, Virginia  23218-0561
Telephone:  (804) 644-1400
Telecopier:  (804) 225-8706

       Counsel for Joseph E. Lew and J. J. Lew, Trustees of "The Lew Family Trust"

## COMPLAINT

Joseph E. Lew and J. J. Lew, Trustees of "The Lew Family Trust" (the "Plaintiff"), by counsel, submits its Complaint for declaratory judgment and other relief, and states the following in support of its Complaint.

### Statement of Parties and Nature of Action

1.    Joseph E. Lew and J. J. Lew are residents of the State of California.  The Lew Family Trust is a trust created under the laws of the State of California.

2.    The Defendant is LandAmerica 1031 Exchange Services, Inc. ("LES"), a Maryland corporation.  LES is a debtor with a Chapter 11 case pending before the United States Bankruptcy Court for the Eastern District of Virginia, Richmond Division (the "Bankruptcy Court").

3.    This is an adversary proceeding commenced pursuant to Rule 7001 *et seq.* of the Bankruptcy Rules and Sections 105(a) and 541 of Title 11 of the Bankruptcy Code for:

   a.    a declaratory judgment that the Funds (*i.e.*, $1,019,379.95 plus accrued and accruing interest, defined below) are the Plaintiff's property rather than property of LES's bankruptcy estate;

   b.    an order (i) enjoining LES from expending, transferring, commingling, adding to, or otherwise modifying the location, amount or characteristics of the Funds and/or the Accounts (defined below), (ii)  directing LES to make the Funds available on a timely basis for the Plaintiff's acquisition of the replacement properties or, alternatively, (iii) directing LES to turn over the Funds to the Plaintiff;

   c.    judgment against LES in an amount to be proven at trial, no less than $1,019,379.95, for damages for LES's willful breach of contract, including interest, cost and fees, including attorney's fees;

   d.    judgment against LES in an amount to be proven at trial, no less than $1,019,379.95, for damages for conversion, including interest, costs and fees, including attorney's fees;

2

e.   judgment against LES in an amount to be proven at trial, no less than
$1,019,379.95, for damages for intentional and improper interference with
the performance of the Plaintiff's contractual obligations, including
interest, costs and fees, including attorney's fees;

f.   judgment finding that (i) LES holds the Funds in an express trust for the
Plaintiff; (ii) directing LES to make the Funds available on a timely basis
for the Plaintiff's acquisition of the replacement property; or alternatively,
(iii) directing LES to turn over the Funds to the Plaintiff;

g.   judgment finding that (i) LES holds the Funds in a resulting trust for the
Plaintiff; (ii) directing LES to make the Funds available on a timely basis
for the Plaintiff's acquisition of the replacement property; or alternatively,
(iii) directing LES to turn over the Funds to the Plaintiff;

h.   judgment finding that (i) LES holds the Funds in constructive trust for the
Plaintiff; (ii) directing LES to make the Funds available on a timely basis
for the Plaintiff's acquisition of the replacement property; or alternatively,
(iii) directing LES to turn over the Funds to the Plaintiff; and

i.   judgment against LES in an amount to be proven at trial, no less than
$2,019,379.95, for damages for LES's fraud, including punitive damages,
interest, cost and fees, including attorney's fees; and

j.   such other relief as this Court deems just and proper under the
circumstances.

## Jurisdiction and Venue

4.   This Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and
1334(b).

5.   This adversary proceeding is a core proceeding pursuant to 28 U.S.C. §§ 157(a)
and 157(b), because it is related to and arises in or under the Chapter 11 case of LES pending in
the Bankruptcy Court.

6.   Venue of this proceeding in this Court is proper pursuant to 28 U.S.C. § 1409(a),
because this is a proceeding relating to and arising under Chapter 11 of the Bankruptcy Code and
LES's Chapter 11 case.

3

7.    This adversary proceeding is commenced pursuant to Sections 105 and 541 of the Bankruptcy Code and Bankruptcy Rules 7001 *et seq.*

## Background

8.    On November 26, 2008 (the "Petition Date"), LES and its parent company, LandAmerica Financial Group, Inc. ("LFG"), filed voluntary petitions for relief under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

9.    LES has continued in possession of its property and assets and has continued to operate and manage its businesses as debtor-in-possession pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code.

10.    The Official Committee of Unsecured Creditors of LES was appointed December 3, 2008.

11.    As of the date hereof, no request for the appointment of a trustee or examiner in the case of LES has been made.

## The Debtor's Business

12.    The officers/directors of LES are Jeffrey C. Selby, Ronald B. Ramos, Holly H. Wenger, and Hope M. Vaughan (the "Officers"). The Plaintiff reserves the right to amend the names of the individuals constituting the Officers as necessary.

13.    LES was engaged in the business of serving as "qualified intermediary" for deferred, like-kind property exchanges consummated under Section 1031 of the Internal Revenue Code, 26 U.S.C. § 1031 ("Section 1031"). Section 1031 permits the seller of property to use the proceeds of the sale to purchase like-kind property without paying capital gains tax on the proceeds of the sale. To preserve the tax deferral, the seller cannot take title to the proceeds and must instead deposit the proceeds with a "qualified intermediary" until such time as the seller is

ready to close on the replacement property. The seller has 45 days from the date of a sale of relinquished property to identify like-kind replacement property and 180 days from the date of the sale to close on the purchase of the replacement property.

14.    An ordinary transaction would involve one of LES's customers assigning the purchase agreement for the sale of the relinquished property to LES at the real estate closing, and LES would transfer the property to the buyer. The buyer would then transfer the purchase price to LES, which would hold the proceeds until the closing of the replacement properties within 180 days. At the replacement property closing, LES would transfer the proceeds of the first sale to the seller of the replacement properties for the purchase of such replacement properties. Such seller would then transfer title to the replacement properties to LES. Finally, LES would transfer title to the replacement properties to the customer. At no time would LES take beneficial ownership of the properties of the proceeds. Rather, it was to hold nominal title only for the purposes of effectuating a Section 1031 exchange.

15.    As of the Petition Date, LES held funds acquired from Section 1031 exchanges involving approximately 450 customers. Approximately 50 of the exchange agreements allegedly required LES to segregate the applicable exchange funds (the "Segregated Customers") and the remaining approximately 400 exchange agreements did not require segregation (the "Commingled Customers").[1] The funds of the Segregated Customers were allegedly placed in individually identified accounts held by LES bearing the Segregated Customer's tax identification number (the "Segregated Accounts"). The funds of the Commingled Customers were allegedly interspersed in accounts held by LES which contained funds from a variety of different sources (the "Commingled Accounts").

---

[1] See Affidavit of G. William Evans, Chief Financial Officer Of LandAmerica Financial Group, Inc. and Vice President of LandAmerica 1031 Exchange Services, Inc., In Support of Chapter 11 Petitions and First Day Pleadings (Evans Affidavit), Docket #17, ¶ 11.

16.     Pursuant to their separate exchange agreements, the Commingled Customers hold claims of $191.7 million.  LES holds the exchange funds allegedly held in the Commingled Accounts.  LES holds approximately $46 million in government treasury bonds, approximately $201.7 million (par value) in auction rate securities ("ARS"), and $227.5 million held in Segregated Accounts.[2]

17.     Due to a lack of liquidity in the market for ARS which began in February 2008, LES has been unable to sell the ARS at a price near their par value.

18.     In September 2008, the board of LFG began to entertain the prospect of placing itself and its subsidiaries (including LES) up for sale in order to combat its fiscal crisis.[3]  On November 7, 2008, LFG executed a merger agreement with Fidelity National Financial ("Fidelity").  The merger fell through on November 21, 2008, as Fidelity exercised a "diligence out" and terminated the merger.[4]

19.     The inability to liquidate the ARS and the failure of LFG's merger with Fidelity led LES to decide to cease additional customer transactions and terminate operations on November 24, 2008.[5]

20.     On the Petition Date, counsel for LES stated on the record that LES (i) does not intend to consummate the Section 1031 exchanges that are the subjects of its executory exchange agreements, and (ii) believes that the funds it is holding in both segregated and commingled bank accounts constitute property of LES's estate.  Further, the Court has entered an order prohibiting LES from, among other things, transferring funds from such bank accounts.

---

[2] Id. at ¶ 16.
[3] Evans Affidavit at ¶ 21.
[4] Evans Affidavit at ¶ 23-24.
[5] Evans Affidavit at ¶ 19.

## General Allegations

21.     In or about August 2008, the Plaintiff closed on the sale (the "Sale") of a certain property (the "Relinquished Property") and entered into an Exchange Agreement, dated August 5, 2008 (the "Exchange Agreement"), with LES to effectuate a Section 1031 tax-deferred exchange on replacement properties. A copy of the Exchange Agreement is attached hereto as Exhibit A. Under the Exchange Agreement, the Plaintiff transferred $1,019,379.95 to LES to be held in trust at one of LES's bank accounts in Richmond, Virginia (the "Accounts"). The $1,019,379.95 in principal has accrued and continues to accrue interest (principal and interest, the "Funds").

22.     The deadline for the Plaintiff to complete its 1031 tax exchange will expire in approximately one month. If the Funds are not turned over to the Plaintiff or if LES does not complete the exchanges on a timely basis in accordance with the Exchange Agreement, the Plaintiff will suffer damages from, among other things: (i) costs of alternative financing; (ii) forfeited deposits; (iii) lost business opportunities; (iv) a claim for potential breach of its contracts with a third party; and (v) the loss of the tax benefits of the Section 1031 exchange.

## FIRST CLAIM FOR RELIEF

### (Declaratory Relief under Section 541 of the Bankruptcy Code)

23.     The Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 22 above as though fully set forth herein.

24.     An actual and substantial controversy exists regarding the Plaintiff's rights to the Funds. The Plaintiff contends that the Funds are its property, while LES contends that the Funds are property of its bankruptcy estate.

25.     LES is holding the Funds in trust for the Plaintiff. LES and the Plaintiff had the

capacity and intent to enter into a trust agreement, and the Exchange Agreement constitutes such

agreement. The relinquished property first constituted the *res* of the trust, which was then

substituted by the Funds. LES is the trustee, both as debtor-in-possession and by the terms of the

Exchange Agreement, and the Plaintiff is the beneficiary of the trust.

26.    Under the Exchange Agreement, the Plaintiff and LES affirmatively agreed that

the Funds would be held for the benefit of the Plaintiff. Section 6(b) of the Exchange Agreement

states that "LES IS ENTERING THIS EXCHANGE AGREEMENT SOLELY FOR THE

PURPOSE OF FACILITATING TAXPAYER'S EXCHANGE OF THE RELINQUISHED

PROPERTY FOR THE REPLACEMENT PROPERTY."

27.    Section 3(b) of the Exchange Agreement provides that the Plaintiff get the benefit

of the accrued interest and assume the responsibility to pay any income tax on the interest.

28.    Nothing in the Exchange Agreement confers to LES any beneficial interest in, or

risks associated with ownership of, the property or the Funds. Rather, the Exchange Agreement

requires LES to accept the relinquished properties, transfer them to the buyers, hold the proceeds

for 180 days or less, accept title to the acquired property and then transfer it to the Plaintiff.

29.    Section 7 of the Exchange Agreement provides that LES's compensation for this

trustee service is limited to $400.00, plus reimbursement of expenses. In contrast, the Funds

exceed $1,019,379.95.

30.    By reason of the foregoing, the Plaintiff seeks a declaratory judgment, under

Section 541 of the Bankruptcy Code, that LES is holding the Funds in trust for the Plaintiff and

that the Funds are not property of LES's bankruptcy estate.

8

## SECOND CLAIM FOR RELIEF

### (Injunctive Relief under Section 105(a) of the Bankruptcy Code)

31.    The Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 30 above as though fully set forth herein.

32.    Section 105(a) of the Bankruptcy Code authorizes the court to issue "any order, process or judgment that is necessary or appropriate to carry out the provisions of this title." Section 541 of the Bankruptcy Code governs property of a debtor's estate.

33.    Contrary to LES's assertions, the Funds are property of the Plaintiff.

34.    This Court is the proper court to make any determination regarding allegations that all or any part of the Funds are the Plaintiff's property.

35.    This Court is the proper court to make any determination regarding whether any party other than the Plaintiff has any superior right, title, or interest to all or any part of the Funds greater than those of the Plaintiff or other parties in interest in LES's bankruptcy.

36.    The Plaintiff will suffer irreparable harm if (i) LES expends, transfers, commingles, adds to, or otherwise modifies the location, amount or characteristics of the Funds and/or the Accounts or (ii) the Funds are not made available on a timely basis to acquire replacement properties.

37.    By reason of the foregoing, the Plaintiff seeks entry of an order: (i) enjoining LES from expending, transferring, commingling, adding to, or otherwise modifying the location, amount or characteristics of the Funds maintained in the Account; (ii) directing LES to make the Funds available on a timely basis for the Plaintiff's acquisition of the replacement property; or alternatively, (iii) directing LES to turn over the Funds to the Plaintiffs.

## THIRD CLAIM FOR RELIEF

### (Breach of Contract)

38.     The Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 37 above as though fully set forth herein.

39.     Under the terms of the Exchange Agreement or applicable agreement(s) between the Plaintiff and LES, and in accordance with applicable law, LES was and continues to be required to transfer the Funds to acquire a replacement property in accordance with the Plaintiff's instructions.

40.     LES's refusal to honor the Plaintiff's instructions was and remains a violation of the Exchange Agreement and/or other valid, binding and applicable agreement(s) between the Plaintiff and LES and/or applicable law.

41.     LES's acts and omissions constitute a breach of the Exchange Agreement and/or other valid, binding and applicable agreement(s) between the Plaintiffs and LES and/or applicable law.

42.     The Plaintiff has suffered and continues to suffer damages, including direct and consequential damages, as a result of LES's willful and wanton breach of the Exchange Agreement and/or other valid, binding and applicable agreement(s) between the Plaintiff and LES and/or applicable law.

43.     By reason of the foregoing, the Plaintiff is entitled to judgment for all direct and consequential damages, no less than $1,019,379.95, resulting from LES's breach of contract, including interest, costs, and fees, including attorney's fees.

## FOURTH CLAIM FOR RELIEF

### (Conversion)

44.    The Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 43 above as though fully set forth herein.

45.    Pursuant to the terms of the Exchange Agreement and/or other valid, binding and applicable agreement(s) between the Plaintiff and LES, and/or in accordance with applicable law, LES was required to acquire the replacement property identified by the Plaintiff in accordance with the Plaintiff's instructions.

46.    The Exchange Agreement or other valid, binding and applicable agreement(s) between the Plaintiff and LES and/or applicable law did not permit LES to refuse to honor requests of the Plaintiff regarding the replacement property.

47.    The Plaintiff has informed LES that it is ready to transfer a portion of the Funds in accordance with the Exchange Agreement to acquire the replacement property.

48.    LES wrongfully refused to honor the Plaintiff's request.

49.    The Plaintiff has suffered and continues to suffer damages as a result of LES's willful and wanton conversion.

50.    By reason of the foregoing, the Plaintiff is entitled to judgment equal to the amount of the Funds plus all direct and consequential damages, no less than $1,019,379.95, from LES's conversion of the Funds, including interest, costs, and fees, including attorney's fees.

## FIFTH CLAIM FOR RELIEF

### (Intentional Interference with Contract)

51.    The Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 50 above as though fully set forth herein.

11

52.    Consistent with the requirements of Section 1031, the Plaintiff is required to enter into an agreement with the seller of the replacement property (the "Replacement Property Agreement").

53.    LES has knowledge of facts that should have led it to inquire as to the existence of the Replacement Property Agreement.

54.    LES's refusal to return the Funds or complete its obligations under the Exchange Agreement constitutes intentional and improper interference with the Plaintiff's performance under the Replacement Property Agreement.

55.    The Plaintiff is suffering significant damages as a result of the intentional and improper actions LES took to interfere with the performance of the Replacement property Agreement.

56.    Accordingly, the Plaintiff is entitled to judgment in its favor for all direct and consequential damages, no less than $1,019,379.95, resulting from LES's actions, which amount to intentional and improper interference with the Plaintiff's performance under the Replacement Property Agreement, including interest, costs, and fees, including attorney's fees.

## SIXTH CLAIM FOR RELIEF

### (Express Trust)

57.    The Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 56 above as though fully set forth herein.

58.    As indicated above, LES and the Plaintiff had the capacity and intent to enter into a trust agreement, and the Exchange Agreement constitutes such agreement. The relinquished property first constituted the *res* of the trust, which was then substituted by the Funds.

59.    LES does not hold unfettered power over the Funds. Instead, LES has the limited

power to invest the Funds in the Account described in the Exchange Agreement.

60.    LES has no authority to disburse the Funds other than pursuant to the Replacement Property Agreement completing the Section 1031 exchange, or after expiration of the time limits provided in the Exchange Agreement.

61.    LES has no equitable interest in the Funds. Absent any equitable interest and holding only bare legal title, LES holds the Funds in an express trust for the benefit of the Plaintiff.

62.    As trust property, the Funds are outside of Debtor's bankruptcy estate.

63.    By reason of the foregoing, the Plaintiff seeks judgment finding that: (i) LES holds the Funds in an express trust for the Plaintiff; (ii) directing LES to make the Funds available on a timely basis for the Plaintiff's acquisition of the replacement property; or alternatively, (iii) directing LES to turn over the Funds to the Plaintiff.

## SEVENTH CLAIM FOR RELIEF

### (Resulting Trust)

64.    The Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 63 above as though fully set forth herein.

65.    LES and the Plaintiff had the capacity and intent to enter into a trust. The relinquished property first constituted the *res* of the trust, which was then substituted by the Funds.

66.    Assuming *arguendo* that the Court determines there is no express trust, the parties intended that the Plaintiff's funds were to be held in trust. See Exhibit A at pg. 2.

67.    Despite the absence of an express trust, a resulting trust arises based upon the intention of the parties.

13

68.    As LES has no authority to disburse the Funds other than pursuant to the

Replacement Property Agreement completing the Section 1031 exchange, or after expiration of

the time limits provided in the Exchange Agreement, the clear intention is that the parties

considered these funds to be held in trust despite the absence of an express trust.

69.    LES has no equitable interest in the Funds.  Absent any equitable interest and

holding only bare legal title, LES holds the Funds in a resulting trust for the benefit of the

Plaintiff.

70.    As trust property, the Funds are outside of Debtor's bankruptcy estate.

71.    By reason of the foregoing, the Plaintiff seeks judgment finding that: (i) LES

holds the Funds in a resulting trust for the Plaintiff; (ii) directing LES to make the Funds

available on a timely basis for the Plaintiff's acquisition of the replacement property; or

alternatively, (iii) directing LES to turn over the Funds to the Plaintiff.

## EIGHTH CLAIM FOR RELIEF

### (Constructive Trust)

72.    The Plaintiff repeats and realleges each and every allegation contained in

paragraphs 1 through 71 above as though fully set forth herein.

73.    Assuming *arguendo* that the Court determines there is no express trust or

resulting trust, principles of equity require that the Funds be found to be held in a constructive

trust.  See Exhibit A at pg. 2.

74.    A constructive trust arises by operation of law, independently of the intention of

the parties; constructive trusts occur not only where property has been acquired by a fraud or

improper means, but also where it has been fairly and properly acquired, but it is contrary to the

principles of equity that it should be retained.

14

75.     The Plaintiff never intended that the Funds were to be placed in any peril, however small. The Plaintiff had no indication that they needed to be placed on their guard in dealing with LES.

76.     Upon information and belief, LES and the Officers took advantage of their size and national reputation to lull the unwary Plaintiff into executing the Exchange Agreement. LES's national stature was used to prey on those who did not understand its financial weakness.

77.     Upon information and belief, despite LES's and the Officers' knowledge that the collapse of the ARS market in February 2008 jeopardized LES's continued viability, LES took the Funds.

78.     Upon information and belief, when LES entered into the Exchange Agreement, LES and the Officers knew of LES's difficult financial position and the possibility of filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code if LES was unable to solve its liquidity crisis. Despite this knowledge, LES entered into the Exchange Agreement.

79.     Upon information and belief, given LES's and the Officers' knowing disregard of the possible risks the transaction held for the Plaintiff, it is inequitable for the Funds to be found to be property of the estate of LES. The Funds should be found to be held by LES in constructive trust for the Plaintiff.

80.     As trust property, the Funds are outside of Debtor's bankruptcy estate.

81.     By reason of the foregoing, the Plaintiff seeks judgment finding that: (i) LES holds the Funds in constructive trust for the Plaintiff; (ii) directing LES to make the Funds available on a timely basis for the Plaintiff's acquisition of the replacement property; or alternatively, (iii) directing LES to turn over the Funds to the Plaintiff.

## NINTH CLAIM FOR RELIEF

### (Fraud)

82.     The Plaintiff repeats and realleges each and every allegation contained in paragraphs 1 through 81 above as though fully set forth herein.

83.     Upon information and belief, Despite LES's and the Officers' knowledge that the collapse of the ARS market in February 2008 jeopardized LES's continued viability, LES took the Funds.

84.     Upon information and belief, when LES entered into the Exchange Agreement, LES and the Officers knew of LES's difficult financial position and the possibility of filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code if LES was unable to solve its liquidity crisis.  Despite this knowledge, LES entered into the Exchange Agreement.

85.     Upon information and belief, at the time of executing the Exchange Agreement, LES and the Officers had no intention of honoring the Exchange Agreement.

86.     Upon information and belief, at the time of executing the Exchange Agreement, LES and the Officers intended to take and use the Funds for LES's own benefit.

87.     Upon information and belief, at the time of executing the Exchange Agreement, LES and the Officers deliberately omitted and failed to represent material facts relating to LES's and the Officers' intention to dishonor the Exchange Agreement, LES's financial crisis, and the possibility of LES filing a voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

88.     Upon information and belief, LES and the Officers made the foregoing misrepresentations and omissions in order to induce the Plaintiff to execute the Exchange Agreement.

89.     The Plaintiff believed and relied upon the representations and promises made to

them by LES, and also believed and relied that LES disclosed all material facts concerning the

Exchange Agreement and LES's financial stability and intention to continue doing business

when entering into the Exchange Agreement.

90.     The Plaintiff has suffered and continues to suffer damages resulting from LES's

fraud.

91.     By reason of the foregoing, the Plaintiff is entitled to judgment equal to the

amount of the Funds plus all direct and consequential damages, no less than $2,019,379.95, from

LES's fraud, including punitive damages, interest, costs, and fees, including attorney's fees.

WHEREFORE, the Plaintiff respectfully requests the following:

a.     On the First Claim For Relief, declaratory judgment that the Funds are the
Plaintiff's property rather than property of LES's estate;

b.     On the Second Claim for Relief, judgment (i) enjoining LES from
expending, transferring, commingling, adding to, or otherwise modifying
the location, amount or characteristics of the Funds and/or the Account,
(ii) directing LES to make the Funds available on a timely basis for the
Plaintiff's acquisition of the replacement property, or alternatively, (iii)
directing LES to turn over the Funds to the Plaintiff;

c.     On the Third Claim For Relief, judgment against LES in an amount to be
proven at trial, no less than $1,019,379.95, for damages for LES's willful
breach of contract, including interest, cost and fees, including attorney's
fees;

d.     On the Fourth Claim For Relief, judgment against LES in an amount to be
proven at trial, no less than $1,019,379.95, for damages for conversion,
including interest, costs and fees, including attorney's fees;

e.     On the Fifth Claim For Relief, judgment against LES in an amount to be
proven at trial, no less than $1,019,379.95, for damages for intentional and
improper interference with the performance of the Plaintiff's contractual
obligations, including interest, costs and fees, including attorney's fees;

f.     On the Sixth Claim For Relief, judgment finding that (i) LES holds the
Funds in an express trust for the Plaintiff; (ii) directing LES to make the
Funds available on a timely basis for the Plaintiff's acquisition of the
replacement property; or alternatively, (iii) directing LES to turn over the

Funds to the Plaintiff;

g.      On the Seventh Claim For Relief, judgment finding that (i) LES holds the
Funds in a resulting trust for the Plaintiff; (ii) directing LES to make the
Funds available on a timely basis for the Plaintiff's acquisition of the
replacement property; or alternatively, (iii) directing LES to turn over the
Funds to the Plaintiff;

h.      On the Eighth Claim For Relief, judgment finding that (i) LES holds the
Funds in constructive trust for the Plaintiff; (ii) directing LES to make the
Funds available on a timely basis for the Plaintiff's acquisition of the
replacement property; or alternatively, (iii) directing LES to turn over the
Funds to the Plaintiff;

i.      On the Ninth Claim For Relief, judgment against LES in an amount to be
proven at trial, no less than $2,019,379.95, for damages for LES's fraud,
including punitive damages, interest, cost and fees, including attorney's
fees; and

j.      Such other relief as this Court deems just and proper under the
circumstances.

**JOSEPH E. LEW AND J. J. LEW,
TRUSTEES OF "THE LEW FAMILY TRUST"**

By_____/s/ Ronald A. Page, Jr._____
                    Counsel

Bruce E. Arkema (VSB No. 18625)
    barkema@cantorarkema.com
Kevin J. Funk (VSB No. 65465)
    kfunk@cantorarkema.com
Ronald A. Page, Jr. (VSB No. 71343)
    rpage@cantorarkema.com
Cantor Arkema, P.C.
Bank of America Center
1111 East Main Street, 16th Floor (23219)
**Mailing Address:** Post Office Box 561
                    Richmond, Virginia  23218-0561
Telephone:  (804) 644-1400
Telecopier:  (804) 225-8706

Counsel for Joseph E. Lew and J. J. Lew, Trustees of "The Lew Family Trust"

18

# EXHIBIT A

© 2002 LandAmerica Financial Group, Inc. All Rights Reserved

LES File Number: SCX-08-000261-00

 **LandAmerica**®
**1031 Exchange Services**

## EXCHANGE AGREEMENT

**THIS EXCHANGE AGREEMENT** ("Exchange Agreement") is made August 5, 2008, by and between **LANDAMERICA 1031 EXCHANGE SERVICES, INC.**, with its principal office in Richmond, Virginia ("**LES**"), and Joseph E. Lew and J.J. Lew, Trustees of "The Lew Family Trust, dated October 26, 2007" ("**TAXPAYER**").

### RECITALS

A.      **Taxpayer** owns that certain parcel or parcels of land, and all improvements thereon and appurtenances thereto located at 3435 West Temple St., Los Angeles, CA and which is more particularly described on Exhibit "A" hereto (the "Relinquished Property").

B.      **Taxpayer** desires to exchange the Relinquished Property for property or properties of like-kind (the "Replacement Property") in an exchange qualifying under Section 1031 and related sections of the Internal Revenue Code of 1986, as amended (the "Code"), and regulations promulgated thereunder.

C.      **LES** is willing and agrees to facilitate such like-kind exchange as provided in this Exchange Agreement.

D.      **Taxpayer** has entered into that certain purchase and sale agreement for the Relinquished Property with Pueblo Nuevo Development ("Recipient") dated June 2, 2008 containing terms related to the purchase, assignment and transfer of the Relinquished Property (as the same may be amended, the "Agreement of Sale"), a copy of which is attached hereto as Exhibit "B".

**NOW, THEREFORE**, for and in consideration of the premises and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, **LES** and **Taxpayer** agree as follows:

### AGREEMENT

1.      **Exchange of Property**.

(a)      LES agrees to acquire from **Taxpayer**, and **Taxpayer** agrees to convey to LES the Relinquished Property, and LES hereby agrees to convey to **Taxpayer**, in exchange for the Relinquished Property, the Replacement Property. **LES** agrees to acquire the Replacement Property from its seller (the "Seller") in a purchase transaction for the purpose of effectuating a like kind exchange.

FM 03                                    1

© 2002 LandAmerica Financial Group, Inc. All Rights Reserved

(b)    On or before the close of the sale for the Relinquished Property (the "Initial Closing Date"), **Taxpayer** shall assign its rights but not its obligations in and under the Agreement of Sale to **LES**, and **LES** agrees to accept an assignment in form and substance approved by **LES**. **Taxpayer** shall give written notice of the assignment of the Agreement of Sale to **LES** to all parties to the Agreement of Sale on or before the Initial Closing Date.

(c)    In order to save duplicative recording fees, escrow costs and other similar charges, **LES** shall on and as of the Initial Closing Date direct **Taxpayer**, and **Taxpayer** shall convey on behalf of **LES**, the Relinquished Property to Recipient. In addition, **Taxpayer** agrees to execute all bills of sale and assignment of leases, security deposits and trade names and other assets, which are necessary to close the transaction directly in favor of Recipient. If closing on the sale does not occur on the Initial Closing Date, as that date may be extended by the parties thereto, **LES** shall assign all of its rights, title and interest in and to the Agreement of Sale to **Taxpayer** by an assignment agreement in form and substance acceptable to **LES** and **Taxpayer** shall accept such assignment.

(d)    The transfers described in this Section 1 are part of an integrated, interdependent, mutual and reciprocal plan intended to effectuate an exchange by **Taxpayer** of like-kind real properties pursuant to and in accordance with the provisions of Section 1031 of the Code, and to the extent possible, state tax statutes.

2.    **Treatment of Exchange Funds**.

(a)    **LES** agrees to hold and apply the Exchange Funds in accordance with the terms and conditions of this Exchange Agreement. For purposes of this Agreement, Exchange Funds shall mean the total consideration received from the closing of the sale of the Relinquished Property reduced by the remaining principal and interest balance of all debts secured by liens against the Relinquished Property, if any, as of the Initial Closing Date, taken subject to by **LES**, all real estate commissions, prorations of income and expenses, closing costs, title insurance premiums, escrow fees, and any other amounts chargeable to **LES** in the closing of the sale for the Relinquished Property. Exchange Funds wired to **LES** and not received by **LES** by 1:00 p.m. Eastern Time will not begin to accrue interest pursuant to paragraph 3(a) below until the next business day. Exchange Funds delivered to **LES** by check will not begin to accrue interest pursuant to paragraph 3(a) below until the second business day after receipt of the check by **LES**. **If the Exchange Funds are to be held less than 48 hours, then no interest shall be paid to Taxpayer on the Exchange Funds.**

(b)    **LES** shall make payments from the Exchange Funds to acquire the Replacement Property or Properties identified in accordance with the Notice(s) of Identification to be completed by **Taxpayer** on or before 45 days from the transfer of the Relinquished Property, and received from or on behalf of **Taxpayer** pursuant to Paragraph 4, including the payment of deposit or option fees provided in the purchase agreement for the purchase of the Replacement Property (the "Replacement Property Contract").

FM 03                                                                                 2

© 2002 LandAmerica Financial Group, Inc. All Rights Reserved

(c)    **LES** shall have sole and exclusive possession, dominion, control and use of all Exchange Funds, including interest, if any, earned on the Exchange Funds until the first business day after the earliest of the following to occur: (i) the end of the Identification Period, as hereafter defined, if **Taxpayer** has not identified the Replacement Property or has properly revoked in writing any identifications of Replacement Property; (ii) after **Taxpayer** has received all the Replacement Property identified pursuant to Section 4 and which **Taxpayer** is entitled to under this Agreement; (iii) the earlier of the date which is 180 days after the transfer of the Relinquished Property to Recipient or the due date of **Taxpayer's** income tax return (including extension) for the taxable year in which the transfer of the Relinquished Property occurs (the "Exchange Period"); or (iv) the date after the occurrence of a material and substantial contingency that (x) specified in the written Notice of Identification, (y) relates to the exchange contemplated by this Exchange Agreement, and (z) is beyond the control of **Taxpayer** or any disqualified person as provided in Treasury Regulation Section 1.1031(k)-1(g)(6)(iii)(B)(3) (the dates described in (i)–(iv) each referred to as a "Termination Date"). **Taxpayer** shall have no right, title, or interest in or to the Exchange Funds or any earnings thereon and **Taxpayer** shall have no right, power, or option to demand, call for, receive, pledge, borrow or otherwise obtain the benefits of any of Exchange Funds, including interest, if any, earned on the Exchange Funds except that the balance of Exchange Funds, if any, held by **LES** after applying such Exchange Funds in accordance with this Exchange Agreement shall be paid to **Taxpayer** on the applicable Termination Date. Provided, however, in no event shall any of the foregoing be deemed the Termination Date prior to the expiration of the Identification Period or as otherwise provided under Treasury Regulation Section 1.1031(k)-1(g)(6).

Notwithstanding anything to the contrary herein, in the event of a Presidentially declared disaster or terroristic military action for which the IRS publishes a Notice and/or Service News Release and with regard to which the **Taxpayer** is an "affected taxpayer", the forty-five (45) day identification period and the Exchange Period shall be deemed to be, and shall be, extended as provided in Rev. Proc. 2007-56 (Section 17), to such later date as authorized by the Revenue Procedure in reference to the IRS News Release or similar authoritative guidance. In such event the restrictions on distribution set forth herein, including as provided for in paragraph (g)(6) of Treas. Reg. 1.1031(k)-(1), shall apply without interruption during the extensions. **LES** has no obligation to notify **Taxpayer** of such a determination.

3.    **Investment of Exchange Funds**.

(a)    **LES** will deposit the Exchange Funds in an account maintained at SunTrust Bank in Richmond, Virginia, and guarantees **Taxpayer** will receive interest on the Exchange Funds at an annualized adjusting rate equal to 100% of the intended Federal Funds Rate as announced by the Federal Open Market Committee less fifty basis points (50 bps), compounded daily, adjusting as the Federal Funds Rate does, one day following the same (the "Growth Factor") from the first business day following receipt of funds via wire transfer at Richmond, Virginia, or from three business days after receipt in Richmond, Virginia if sent by check, to the day of withdrawal. **LES** and **Taxpayer** agree that the Growth Factor, if not applied to the acquisition of the Replacement Property identified by **Taxpayer** pursuant to Paragraph 4, shall be paid to **Taxpayer** after the Termination Date. **Taxpayer** acknowledges and agrees that the amount of the Exchange Funds may be in excess of the maximum amount of deposit insurance

© 2002 LandAmerica Financial Group, Inc. All Rights Reserved

carried by the depository institution indicated above; however, **LES** unconditionally guarantees the return and availability of the Exchange Funds and the guaranteed interest stated above.

(b)    **LES** shall file information returns reporting as taxable income to **Taxpayer** the interest and other earnings, if any, paid to **Taxpayer** during any calendar year on such returns, reports, and other filings as are required by applicable law. **Taxpayer** represents and warrants to **LES** that its **social security or taxpayer identification number** is _____ᶦ ___-3549___ᵗ___ ___-7162___. **Taxpayer** will recognize such interest and other earnings, if any, as taxable income to **Taxpayer** regardless of whether such interest or other earnings are used to acquire Replacement Property. LES shall have no obligation to pay any income, gains or other taxes that may be imposed with respect to any of the transactions contemplated by this Exchange Agreement. Taxpayer further certifies under penalties of perjury that Taxpayer is not a "foreign person" as defined by Section 1445 of the Code and the regulations promulgated thereunder, and that the Taxpayer is not subject to backup withholding.

4.    **Identification of Replacement Property**.

(a)    On or before midnight of the date that is forty-five (45) days after the date of the transfer of the Relinquished Property (in the event there is more than one Relinquished Property, forty-five (45) days after the transfer of the first Relinquished Property) to or on behalf of **LES** (the "Identification Period"), **Taxpayer** shall identify the Replacement Property to be received by **Taxpayer** in exchange for the Relinquished Property. Such identification shall be effectuated by one or more Notices of Identification signed by **Taxpayer**. Notices of Identification shall be in writing and shall be hand delivered, mailed (certified, return receipt requested), or sent by facsimile to **LES** or to any other party involved in the exchange other than Taxpayer or a disqualified person before the end of the Identification Period. **Taxpayer** shall give **LES** prompt written notice of any changes, deletions, or additions and may revoke a Notice of Identification only by a written notice (a "Notice of Revocation") signed by the Taxpayer and hand delivered, mailed (certified, return receipt requested), or sent by facsimile to **LES** before the end of the Identification Period. To be effective, a Notice of Identification sent to **LES** by facsimile must be sent to the facsimile number shown in Paragraph 9.

(b)    When **LES** receives the Notice of Identification, it will sign such Notice of Identification, indicating its proper receipt within the Identification Period. **Taxpayer** agrees that the Replacement Property shall be identified on the Notice of Identification in accordance with the following principles:

(i)    **Taxpayer** shall unambiguously describe the Replacement Property using either its complete legal description, complete street address, Assessor's Parcel Number, or distinguishable name.

(ii)    **Taxpayer** shall identify only that number of Replacement Properties which meets one of the following "rules": (x) three (3) properties without regard to the fair market value of the properties; (y) any number of properties so long as their aggregate fair market value as of the end of the Identification Period does not exceed two hundred percent (200%) of the

© 2002 LandAmerica Financial Group, Inc. All Rights Reserved

aggregate fair market value of the Relinquished Property as of the date such Relinquished Property was transferred by **Taxpayer**; or (z) any number of properties without regard to their fair market value so long as **Taxpayer** receives identified Replacement Properties constituting at least ninety-five percent (95%) of the aggregate fair market value of all identified Replacement Properties before the end of the Exchange Period.

**TAXPAYER HEREBY ACKNOWLEDGES THAT TAXPAYER HAS DISCUSSED THE REGULATION PROVISIONS RELATED TO IDENTIFICATION OF ONE OR MORE REPLACEMENT PROPERTIES WITH TAXPAYER'S TAX ADVISOR AND LES IS ACTING SOLELY AS THE INTERMEDIARY AND HAS NOT OFFERED OR PROVIDED ANY TAX ADVICE TO TAXPAYER.**

5.    **Acquisition of Replacement Property**.

(a)    **Taxpayer** shall have the sole duty and obligation to identify Replacement Property and enter into such contracts and agreements as may be necessary or proper to permit **LES** to acquire such Replacement Property.  At or before the Exchange Closing, **Taxpayer** shall assign its rights in but not its obligations under the Replacement Property Contract to **LES**. However, **LES** shall have no obligation to accept such an assignment unless (i) **LES** can terminate the Replacement Property Contract by the payment of liquidated damages in an amount not to exceed the Exchange Funds less any sum estimated in good faith by **LES** as being necessary to pay any fees then earned by **LES** for its services hereunder and to reimburse any expenses then or to be incurred by **LES** hereunder, (ii) the Seller of the Replacement Property agrees in writing to deed the Replacement Property as directed by **LES**, (iii) the Seller of the Replacement Property consents in writing to the assignment of **Taxpayer's** rights in the Replacement Property Contract to **LES**, and (iv) at the time of such assignment, the amount of the Exchange Funds is sufficient to satisfy the total costs and expenses to be incurred by **LES** in acquiring the Replacement Property and conveying it to **Taxpayer** (the "Replacement Cost"), including, without limitation, the aggregate amount of all deposits and expenditures by **LES** in respect to the purchase price, real estate commissions, prorations of income and expenses, closing costs, title insurance premiums, escrow fees, and any other amounts otherwise chargeable to **LES** in connection with the acquisition and conveyance of the Replacement Property to **Taxpayer**, but excluding any existing mortgage, trust deed or other secured loans which may be assumed or taken subject to by **Taxpayer**.  The assignment shall be made using the form of assignment approved in form and substance by **LES**. **Taxpayer** shall give written notice of assignment provided in this Paragraph 5(a) to all parties to the Replacement Property Contract being assigned on or before the closing of the Replacement Property and shall obtain written acknowledgment from all such parties that the notice of assignment was received prior to such closing by having such parties execute the acknowledgment at the bottom of said assignment. **Taxpayer** shall provide **LES** at least three (3) business days prior notice of any scheduled closing of a Replacement Property.  In order to provide timely wiring of Exchange Funds, unconditional and proper wiring instructions must be provided by **Taxpayer** to **LES** in writing no later than three business days before the day the wire is to be initiated, unless **Taxpayer** has made alternative arrangements with **LES**.

(b)    **LES** shall acquire and transfer, or cause to be transferred, to **Taxpayer**, and **Taxpayer** agrees to accept the Replacement Property or properties identified by **Taxpayer**

© 2002 LandAmerica Financial Group, Inc. All Rights Reserved

pursuant to Paragraph 4.  In the event the Replacement Cost for any Replacement Property exceeds the Exchange Funds, **Taxpayer** shall deliver to **LES** just prior to any closing on a Replacement Property, the amount of the deficiency, as determined by **LES** in its sole discretion, in collected funds, or shall provide assurances acceptable to **LES**, in its sole discretion, that sufficient funds will be available at the Exchange Closing to satisfy the deficiency.  **LES** shall not be required in connection with the acquisition of any property or properties to (i) assume any loan, mortgage, liability or other obligation, or (ii) pay any cash in excess of the Exchange Funds; or (iii) take legal title to any property or properties.  All such matters shall be the sole duty and obligation of **Taxpayer**, and **Taxpayer** shall indemnify, hold harmless, and defend **LES** from any and all actions, claims, liabilities, costs, and expenses including costs of investigation, court costs and attorneys' fees and disbursements in connection with the transactions contemplated by this Exchange Agreement.

6. **Duties of LES**.  It is understood and agreed by the parties to this Exchange Agreement that:

(a)   **LES** has entered into this Exchange Agreement with the intention of being a "qualified intermediary" within the meaning of Section 1.1031(k)-1(g)(4)(iii) of the Regulations on the date hereof and shall use its best efforts to retain that status until all of the Exchange Funds have been disbursed in accordance with this Exchange Agreement.  **LES** and **Taxpayer** acknowledge and agree that this Exchange Agreement is intended to satisfy the "safe harbor" provisions of Section 1.1031(k)-1(g) of the Regulations.

(b)   **LES IS ENTERING INTO THIS EXCHANGE AGREEMENT SOLELY FOR THE PURPOSE OF FACILITATING TAXPAYER'S EXCHANGE OF THE RELINQUISHED PROPERTY FOR THE REPLACEMENT PROPERTY.  NONE OF LES' ACTIONS UNDER THIS EXCHANGE AGREEMENT SHALL CONSTITUTE LEGAL, TAX OR OTHER ADVICE OR REPRESENTATIONS TO TAXPAYER OR ANY OTHER PERSON OR ENTITY.  LES MAKES NO REPRESENTATIONS REGARDING THE TAX CONSEQUENCES OF THE TRANSACTIONS CONTEMPLATED BY THIS EXCHANGE AGREEMENT, INCLUDING QUALIFICATION OF THE TRANSACTIONS SET FORTH HEREIN AS A LIKE-KIND EXCHANGE UNDER SECTION 1031 OF THE CODE OR ANY OTHER MATTER.  TAXPAYER HEREBY REPRESENTS TO LES, AND ACKNOWLEDGES THAT LES IS RELYING ON SUCH REPRESENTATION IN EXECUTING THIS EXCHANGE AGREEMENT, THAT TAXPAYER HAS EXECUTED THIS EXCHANGE AGREEMENT BASED ON THE ADVICE OF TAXPAYER'S LEGAL AND TAX ADVISERS WITH RESPECT TO ALL ASPECTS OF THIS EXCHANGE AGREEMENT AND THE TRANSACTIONS CONTEMPLATED THEREBY, INCLUDING BY WAY OF ILLUSTRATION, AND NOT LIMITATION, FEDERAL, STATE, AND LOCAL TAX CONSEQUENCES, AND EXPRESSLY RELEASES LES FROM AND COVENANTS NOT TO SUE LES FOR ANY LIABILITY WITH RESPECT THERETO, EXCEPT FOR LES' WILLFUL MISCONDUCT, GROSS NEGLIGENCE OR FRAUD.**

(c)   **LES** shall only be obligated to act as an intermediary in accordance with the terms and conditions of this Exchange Agreement and shall not be bound by any other contract or

© 2002 LandAmerica Financial Group, Inc. All Rights Reserved

agreement, whether or not **LES** has knowledge of any such contract or agreement or of its terms or conditions. **LES** has undertaken to perform only such duties as are expressly set forth herein, and no additional duties or obligations shall be implied hereunder or by operation of law or otherwise.

(d)   **LES** shall not be liable to **Taxpayer** or any person or entity for any damages, losses, costs, expenses, or taxes that it or they may incur as a result of any act or omission of **LES** under this Exchange Agreement unless such damages, losses, expenses, or taxes are caused by **LES'** willful misconduct, gross negligence or fraud. **LES** shall not incur any obligation or liability with respect to (i) any action taken or omitted in good faith upon the advice of its counsel or counsel for any other party hereto, given with respect to any questions relating to the duties and responsibilities of **LES** under this Exchange Agreement, or (ii) any action taken or omitted in reliance upon any instrument, including due execution thereof or the identity or authority of any person executing such instrument, its validity and effectiveness, but also as to the truth and accuracy of any information contained therein that **LES** shall, in good faith, believe to be genuine, to have been signed by a proper person or persons and to conform to the provisions of this Exchange Agreement.

(e)   Except for damages, losses, or expenses caused by **LES'** willful misconduct, gross negligence or fraud, **Taxpayer** shall indemnify, hold harmless, and defend **LES** from and against any and all actions, suits, claims, charges, costs, losses, damages, liabilities, expenses, including costs of investigation, court costs, and attorneys' fees and disbursements that may be brought or imposed upon **LES** in connection with its actions hereunder, including any litigation arising in connection with this Exchange Agreement or involving the subject matter hereof as and when incurred. This obligation shall survive termination of this Exchange Agreement.

(f)   Should any dispute arise with respect to the delivery or ownership or right of possession of any of the Exchange Funds, **LES** is authorized and directed to retain in its possession without liability to any person or entity, all or any part of the Exchange Funds until such dispute is settled either by mutual written agreement of the parties concerned or by a final order, decree or judgment of a court of competent jurisdiction in the United States of America as to which time for appeal has expired and no appeal has been perfected, but **LES** shall be under no duty whatsoever to institute or defend any such proceedings.

(g)   **LES** shall not, by act, delay, omission or otherwise, be deemed to have waived any right or remedy it may have either under this Exchange Agreement or generally, unless such waiver be in writing and signed by **LES**, and such waiver shall constitute a waiver only to the extent expressly set forth therein. A waiver by **LES** under the terms of this Exchange Agreement shall not be construed as a bar to, or a waiver of, the same or any other such right or remedy that it would otherwise have on any other occasion.

7.   **Facilitation Fee**.   Upon execution hereof, **Taxpayer** shall pay **LES** a nonrefundable set-up fee of $400. In addition, **Taxpayer** shall reimburse **LES** for any and all costs paid or incurred by **LES** in connection with acting as an exchange facilitator pursuant to this Exchange Agreement. There will be closing fees of $250 to be paid for each additional Replacement Property to be due on the date of closing of such Replacement Property.

© 2002 LandAmerica Financial Group, Inc. All Rights Reserved

8.    **Conditions Precedent**.  **LES'** obligations under this Exchange Agreement shall be subject, to the extent not waived by **LES**, to (i) the **Taxpayer** and all other parties to the transactions contemplated herein performing all obligations and complying with all conditions required by or otherwise set forth in this Exchange Agreement; (ii) all proceedings to be taken by the parties with respect to the transactions contemplated herein being taken pursuant to valid authority, being duly authorized and approved and being evidenced in a manner reasonably satisfactory in form and substance to **LES**; (iii) no statute, rule, regulation, court order, administrative order, or regulation being proposed, enacted, or in effect, which would or might restrain or prohibit the transactions contemplated hereby or that would seek to prohibit, delay or challenge any such transactions.

9.    **Notices**.  Each notice, instruction or other certificate required or permitted by the terms hereof shall be in writing and shall be communicated by hand delivery, facsimile, Federal Express or another similar overnight document delivery service, or United States mail, postage prepaid (certified, return receipt requested), to the parties at the following addresses:

If to **Taxpayer**:      30308 Via Borica
                Rancho Palos Verdes, CA  90275
                Phone:  (213) 989-7788
                Fax:  (213) 989-7755


If to **LES**:        **LandAmerica 1031 Exchange Services, Inc.**
                Karla Torres
                915 Wilshire Blvd., Suite 2100
                Los Angeles, CA  90017
                Phone:  (877) 278-1031
                Fax:  (213) 330-3108

Any such notice, request or consent shall be deemed to have been given or made when delivered in person to the party to whom the communication is addressed, or when sent by facsimile to such party at the address indicated, or on the next business day after being sent by Federal Express or similar overnight document delivery service or on the third day after the postmark date of mailing when sent by certified mail.  Any party may change the address at which it is to receive notices by so advising the other parties in writing.  To be effective, any such notice, request or consent sent by facsimile must be sent to the facsimile number shown above.

10.    **Taxpayer's Representations**.  **Taxpayer** hereby represents to **LES** as follows:

(a)    **Taxpayer** has held the Relinquished Property for the purposes of productive use in a trade or business or investment and has not held such property primarily for sale.  **Taxpayer** intends to hold the Replacement Property for purposes of productive use in a trade or business or investment and will not hold such property primarily for sale.

© 2002 LandAmerica Financial Group, Inc. All Rights Reserved

(b)    **Taxpayer** will not purchase any Replacement Property from a related person as such term is defined in Section 1031(f)(3) of the Code.

(c)    **Taxpayer** acknowledges that for complete tax deferment under Section 1031 of the Code, **Taxpayer** must trade up or trade even in value, debt and equity. Any cash Taxpayer receives from the exchange transaction may be taxable.

(d)    The aggregate fair market value of any incidental property being transferred with the Replacement Property does not exceed fifteen percent (15%) of the aggregate fair market value of the Replacement Property.

11.    **Miscellaneous**. This Exchange Agreement may be modified, altered, or amended only by the written agreement of all the parties. This Exchange Agreement shall be governed by and construed in accordance with the applicable laws of the Commonwealth of Virginia without regard to the conflict of laws provisions thereof, (except with respect to matters of corporation law in which case the law of the state of domestication shall apply), and shall be binding upon and shall inure to the benefit of the parties and their respective successors in interest and permitted assigns. Each of the parties hereby consents and submits to personal jurisdiction in the Commonwealth of Virginia for all matters that may arise with respect to this Exchange Agreement, and waives any and all rights to object to jurisdiction within the Commonwealth of Virginia. The parties consent to venue in the Circuit Court of the City of Richmond, Virginia and, to the extent there is subject matter jurisdiction, in the Richmond Division of the United States District Court for the Eastern District of Virginia. No party hereto shall make or raise any claim of forum non conveniens with respect to any court located in the Commonwealth of Virginia as to any litigation regarding this Exchange Agreement. The paragraph headings and subheadings contained in this Exchange Agreement are for convenience and reference only, and shall not in any way affect the meaning or interpretation of this Exchange Agreement. This Exchange Agreement may be executed in any number of counterparts and each shall be considered an original and together they shall constitute one agreement. Facsimile signatures on this Exchange Agreement or any other document called for or contemplated in this Exchange Agreement shall be deemed original signatures. This Exchange Agreement contains the entire understanding between and among the parties hereto. **Taxpayer** may not assign this Exchange Agreement. Should a court of competent jurisdiction find any portion of this Exchange Agreement to be invalid or unenforceable, the remaining terms and provisions hereof shall not be affected and shall remain in full force and effect. Each party hereto and their legal counsel have reviewed this Exchange Agreement and have had an opportunity to revise (or request revision of) this Exchange Agreement and, therefore, any usual rules of construction requiring that ambiguities are to be resolved against a particular party shall not be applicable in the construction and interpretation of this Exchange Agreement. Should the language of any provision herein be deemed to negate a like-kind exchange within the meaning of Section 1031 as to **Taxpayer**, it shall be interpreted and applied in order to comply with Section 1031 of the Code, Regulations, case law, and administrative pronouncements interpreting the Code and Regulations.

12.    **Waiver of Jury Trial**. THE PARTIES WAIVE TRIAL BY JURY OF ANY AND ALL DISPUTES ARISING HEREUNDER OR RELATED HERETO AND AGREE

© 2002 LandAmerica Financial Group, Inc. All Rights Reserved

**THAT ALL SUCH DISPUTES SHALL BE TRIED AND DECIDED SOLELY BY A JUDGE SITTING WITHOUT A JURY.**

**WITNESS** the following signatures:

**LANDAMERICA 1031 EXCHANGE SERVICES, INC.**

By:    Karla Torres, Assistant Vice President

Signature: _____    Date: _____

**TAXPAYER:**        Joseph E. Lew and J.J. Lew, Trustees of "The Lew Family Trust, dated October 26, 2007"

By: *MR. JOSEPH LEW*

Signature: *[signature]*        Date: 10/27/08

By: *MRS. JOSEPH LEW*

Signature: *[signature]*        Date: 10/27/08